# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5602-16T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

O.P.,[1]

     Defendant-Appellant,

and

K.V.

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.V.,

     a Minor.

_____

Argued January 24, 2019 – Decided May 2, 2019

---

[1] We use initials and pseudonyms to protect the privacy rights of the litigants and the child. R. 1:38-3(d)(12).

Before Judges Fuentes, Vernoia and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0299-16.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Mohamed Barry, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Mohamed Barry, on the brief).

Rachel E. Seidman, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Rachel E. Seidman, on the brief).

PER CURIAM

Defendant O.P. (Olga) is the biological mother of M.V. (Mary), a child born in 2008. Mary alleged her biological father, defendant K.V. (Kevin), sexually molested her when she was six years old. The Division of Child Protection and Permanency (Division) filed a verified complaint in the Family Part against defendant, alleging she abused and neglected her daughter within the meaning of N.J.S.A. 9:6-8.21(c)(3) and N.J.S.A. 9:6-8.21(c)(4).

At a fact-finding hearing conducted pursuant to N.J.S.A. 9:6-8.44, Judge Bernadette N. De Castro found the Division established, by a preponderance of

the evidence, that defendant abused and neglected Mary by failing to protect her from Kevin's sexual molestation. Judge De Castro found defendant did not exercise the minimum degree of care expected from a parent under these circumstances. The judge further found defendant acted in a grossly negligent or wanton manner by failing to: (1) report the sexual abuse to law enforcement authorities in a timely manner; and (2) take appropriate action to remove Kevin from the household. Consequently, defendant placed her daughter in imminent and prolonged danger of substantial harm. See Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180-82 (2015).

In this appeal, defendant argues the Division did not prove, by a preponderance of the evidence, that she was aware that Kevin's "one-time sexual abuse of her daughter" exposed Mary to a substantial risk of harm. Defendant also argues the record developed by the Division before the Family Part does not support the judge's finding of abuse and neglect against defendant because the child "was not left alone with the father in a private setting." We reject these arguments and affirm substantially for the reasons expressed by Judge De Castro in her December 6, 2016 memorandum of opinion.

We derive the following facts from the evidence presented by the Division before Judge De Castro.

A-5602-16T1

# I

At six o'clock in the morning on February 29, 2016, defendant called the North Bergen Police Department seeking protection from Kevin under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. Defendant alleged that in the course of a verbal dispute with Kevin about the location of car keys, Kevin physically assaulted her by pushing her down the stairs. Defendant also told the responding police officers that approximately seventeen months earlier, her then seven-year-old daughter Mary told her that Kevin sexually molested her when she was six years old. The North Bergen Police Department immediately notified the Division and the Hudson County Prosecutor's Office (HCPO).

Division investigator Lauren Pirro responded to defendant's residence at 10:40 a.m. that same day. Pirro memorialized this initial encounter with defendant in a report admitted into evidence at the fact-finding hearing. The report stated:

> [Defendant] greeted the worker with a handshake and welcomed the workers into her home. The family resides in a house, which consists of 3 separate apartments. On the first floor of the home, [Mary's] paternal grandparents reside. On the second floor of the home, the worker observed [Mary's] bedroom, which consisted [of] appropriate sleeping arrangements where [Mary] did have her own bed and furniture. Also

4

observed was a second bedroom on this floor, where [defendant] reported she sleeps. The attic apartment consists of another bedroom, where it was reported [Kevin] sleeps. To enter into the second and third floor, an individual must enter into the living room of the first floor and go up the stairs, which has a door at the entrance. The interview took place in the small living room on the second floor of the home.

Defendant told Pirro that Mary resided with Kevin and his family from January until August 2014. Defendant also disclosed her prior involvement with "Child Protective Services in both Rhode Island and in New Jersey." Defendant admitted to Pirro that the Rhode Island child welfare agency had removed Mary from her care, but did not elaborate on the circumstances that prompted the child's removal. Defendant also told Pirro that she was sexually molested when she was six years old by her youngest brother's father. She claimed that this man was incarcerated at the time. Defendant's childhood was far from stable. Her maternal aunt adopted her because her biological mother suffered from a combination of drug addiction and mental illness.[2]

Defendant and Kevin had a tumultuous relationship beset by domestic violence. Defendant has been arrested for "keying [Kevin's] car multiple times

---

[2] In her report, Pirro noted that defendant "became very emotional when speaking about her parents" and was unable to provide "any information about her parents."

out of anger due to the domestic violence." Defendant admitted that Mary was present during these incidents "but [she] would typically stay in her bedroom when her parents were fighting." Defendant told Pirro that Kevin has tested positive for cocaine and she once found a "'crack pipe' in his cigarette box." Defendant has been diagnosed "with bipolar disorder, anxiety, and depression." Although defendant claimed she was not under any medication, she told Pirro she had been prescribed Zoloft for anxiety and Remeron for depression. She was previously hospitalized at Rhode Island Hospital in Pawtucket because of her mental health issues.

Special Victims Unit Investigators from the HCPO also interviewed Mary regarding her allegations of sexual molestation by her father. At the fact-finding hearing before Judge De Castro, the Division presented into evidence the video recording of Mary's interview. The record before us includes the transcript of this interview. Mary provided the following account of her father's abuse:

> INVESTIGATOR: What happened, what did you tell your mom?
>
> CHILD: That daddy (inaudible)
>
> INVESTIGATOR: When did this happen?
>
> CHILD: A long time ago.

6

INVESTIGATOR: And do you remember where you were when this happened?

CHILD: At my house.

    . . . .

INVESTIGATOR: And where were you in the house when this happened?

    . . . .

Okay, and what did dad - - what did dad ask you to do? Can you tell me more about that?

    . . . .

Okay.  So, your dad was sick.  What did your dad ask you to do?

CHILD: Touch his private.

    . . . .

INVESTIGATOR: Okay.  What part of your body touched his body?

CHILD: My hand.

INVESTIGATOR: Okay.

CHILD: His private.

INVESTIGATOR: His private.  Can you show me with the doll what happened?  So your hand touched his private, okay.  Did this happen once, more than once?

CHILD: Once.

A-5602-16T1

Mary was not receptive to the use of an anatomically correct doll to explain what occurred. However, the child was able to describe enough details to infer that her father induced her to masturbate him until he ejaculated. According to Pirro, the account of the molestation Mary revealed to defendant seventeen months earlier was consistent with the details the child described to the HCPO's investigators. Pirro also described what the child told her directly:

> Q. And what, if anything, did [Mary] report to you regarding the sexual abuse allegation?
>
> A. [Mary] was very hesitant to disclose any information about the sexual abuse. She just kept saying I just don't want my dad to go to jail. I don't want anybody to get in trouble but then she later said that one night, she said also that it was summer time, that she went upstairs to her father's bedroom. She didn't know what time it was. She said that he was laying in his bed naked and asked her to get lotion from his drawer and rub it on his private parts. She - -
>
> Q. Did she describe anything about her father's private parts?
>
> A. She described it as hairy and soft and said that jelly came out if it.

In the Division report, Pirro wrote that Mary told her mother of the sexual abuse while the two of them were alone in the car. Mary "reported that her mother yelled and she started screaming and became very angry." When Pirro asked defendant why she did not report Kevin's sexual abuse sooner, defendant

8

told her "she was fearful that [Mary] would be removed from her." Defendant also told Pirro "that she protected [Mary] by not allowing [Kevin] to be alone with her." Defendant also told Pirro that she talked to Kevin "immediately after finding out that this happened and then later had a family meeting with [Kevin] . . . [and] his brother."

On the evening of February 29, 2016, the Division conducted an emergency removal of Mary. Division records indicate that defendant was "very upset" and viewed herself as the victim who was being unduly punished. Defendant told the Division caseworker that she would leave the State and take Mary to Rhode Island. Defendant was particularly concerned about where she was going to reside. The Division caseworker provided her with the location of a local shelter and "contact information for the Homeless Hotline."

At 11:50 p.m. on February 29, 2016, the Division caseworker contacted Kevin and informed him of the allegations against him and of the emergency removal of his daughter. Kevin denied he ever sexually abused his daughter and told the caseworker he believes defendant may have told the child to fabricate these accusations against him. The Division filed a verified complaint against both parents on March 2, 2016. The Family Part granted the Division's application for custody of Mary pending the outcome of the litigation.

On March 10, 2016, Patricia Sermabeikian, Ph.D. and LCSW, at the Audrey Hepburn Children's House (Audrey Hepburn) evaluated Mary. The report prepared by Dr. Sermabeikian included the child's responses to questions concerning the sexual molestation by her father. Based on the child's answers to a series of questions concerning this incident, the child again confirmed the details of the molestation. The report also included the following comments the child made concerning her parents:

> [Mary] continuously asked about returning to her family, specifically to return to her mother and father. [Mary] reported that her mother is "crazy," and she yells and screams. She does have a strong attachment to her mother, and to her family. She loves her mother and misses her. They have shared positive experiences. She has also witnessed domestic [violence] and heard parental conflicts, and expressed that she is fearful that they will fight and one of them will die. She explained that her father smokes a pipe and she believes that it is drugs. She also expressed having positive experiences with her father. [Mary] did not report physical abuse by anyone. She is socially isolated by her family and does not have friends due to the visitation issues. She has spent the majority of her time with family members.
>
> . . . .
>
> According to the information provided by [the] DCPP, the sexual abuse was not reported to authorities by numerous family [members], which left [Mary] unprotected. Her separation and loss issues are devastating for her. She cried and appeared sad, and inconsolable. [Mary] has multiple adverse life

experiences and has lived in a hostile home environment. She is emotionally fragile and distressed. [Mary] was removed via DODD[3] from her mother's care and placed in foster care. DCPP would like to place her with her paternal grandparents. The risk factors are significant and are high.

At a case conference hearing held on April 27, 2016, the Deputy Attorney General representing the Division confirmed before Judge De Castro that on March 23, 2016, the child was placed with the paternal grandparents after Kevin moved out of the apartment.

On April 13 and May 12, 2016, Eloise J. Berry, Ph.D., a staff psychologist at Audrey Hepburn, conducted a parenting evaluation and clinical interview of defendant. Dr. Berry described defendant as emotionally defensive and dysregulated. Defendant refused to discuss with Dr. Berry her psychiatric issues and "suggested that the evaluator should obtain her psychiatric records." When Dr. Berry confronted defendant with Division records documenting her bipolar disorder, anxiety, and depression diagnoses, defendant claimed she had not taken any prescribed psychiatric medication for the past two years. Finally, when Dr. Berry asked defendant why she did not report her daughter's sexual

---

[3] A "Dodd removal" refers to the emergency removal of a child from a home without a court order as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82. See N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011) (citations omitted).

abuse by Kevin, defendant appeared "emotional as she maintained that she did nothing wrong with regard to the referral issue and that [Kevin] and his parents had not been held accountable." Dr. Berry ultimately reached the following clinical conclusion:

> In [defendant's] attempt to present as well-adjusted during the parenting interview and testing, she ultimately presented as dysregulated as she was unable to tolerate frustration or intense negative emotions related to the referral issue. Subsequently, there is concern regarding [defendant's] emotional stability when under stress.

Dr. Berry recommended: (1) the Division obtain defendant's psychiatric records; (2) defendant receive counseling to address "neglect of her daughter and her poor judgment" that exposed the child "to unnecessary risk related to sexual abuse and exposure to domestic violence and substance abuse"; (3) defendant submit to an updated psychiatric evaluation and need for psychotropic medication; (4) defendant submit to random drug screening; and (5) defendant have supervised contacts with her daughter until these issues are addressed.

The Division also presented the testimony of psychologist Anthony Vincent D'Urso, Ph.D., whom the parties stipulated as an expert witness in psychology. At the request of the Division, Dr. D'Urso conducted two psychological evaluations of Mary related to her father's sexual molestation "to

12

assess her emotional functioning." The first evaluation occurred on March 10 and the second on November 3, 2016. Dr. D'Urso explained that the first evaluation was dedicated to explaining the process to Mary "to make sure that she understood the purpose of the evaluation."

In this initial encounter, Dr. D'Urso testified that Mary described to him in detail what her father asked her to do. Based on Mary's account, Dr. D'Urso opined there was "clinical support" to find Mary had been sexually abused. When asked to elaborate, Dr. D'Urso explained that Mary "gave a description of sexual behavior that theoretically is beyond her age and stage of development." Dr. D'Urso also noted that the description of the sexual act Mary provided to him was "in large part" consistent with the description the child gave to the Division investigator and to the law enforcement investigators with the HCPO. In this respect, Dr. D'Urso explained:

> There's going to be no perfect repetitions in the multiple interviews that occur. She gave information that was talked about and seen in other evaluations that were similar. So, the basis was that she had an effective response, an emotional response to the abuse. It did not appear to us that she had a motive to fabricate. She's connected to her father emotionally, to her mother emotionally, to her [paternal] grandparents emotionally. It was a disclosure she had made approximately 18 months before the investigation began. She maintained the allegation in terms of the series of interviews she was involved in in the

13

investigative side as well as at [Audrey Hepburn]. So, all those factors coming together told us that clinically that we would treat the sexualized behavior.

Dr. D'Urso evaluated Mary again on November 3, 2016, in response to her paternal grandfather's allegation that Mary had recanted her allegations against her father and that defendant "had, in essence, influenced the child to make the allegation." Dr. D'Urso testified that in the course of this second evaluation, Mary made clear "that the events really happened. She felt shameful, guilty, [and] shy about discussing the details again. She reported that what she said previously was true . . . [.]" Dr. D'Urso made clear that Mary did not say anything during this second evaluation to cause him to question his earlier clinical opinion or provide any grounds to modify his assessment of the veracity of her allegations of sexual molestation.

Dr. D'Urso evaluated defendant on April 13 and May 12, 2016, and Kevin on April 22, 2016. Dr. D'Urso testified that these evaluations were designed to determine whether they had the parenting capacity to protect their daughter. With respect to defendant, Dr. D'Urso testified:

> She indicated that [the sexual molestation] occurred somewhere in the summer of 2014. She reported that [Mary] told her about this, that [Mary] told her - - her father and her uncle, initially, and then [defendant] reported these allegations to the paternal grandparents.

Kevin denied he sexually molested Mary and claimed defendant

> coached his daughter into making the disclosure, that if it was really true . . . she should have made this disclosure long before she did and that this was an outgrowth of a longstanding conflict . . . in their relationship where she attempted to hurt him in many different ways.

Dr. D'Urso testified that Kevin's accusations against defendant did not provide any basis to alter his clinical assessment of Mary.

## II

Against these salient facts, Judge De Castro found, by a preponderance of the evidence, that: (1) Kevin sexually molested Mary when she was six years old; and (2) defendant acted in a wanton and grossly negligent manner and placed her daughter in a substantial risk of harm when she failed to timely report the abuse to law enforcement authorities. Judge De Castro acknowledged that pursuant to N.J.S.A. 9:6-8.46(a)(4), "a child's statements regarding sexual abuse are not reliable unless they can be corroborated." Relying on N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002), Judge De Castro found Mary's account of the sexual molestation by her father was corroborated by her description of the act itself, which included details of sexual activity that are reasonably beyond the knowledge of a seven-year-old child. This was also supported by Dr. D'Urso's expert testimony.

A-5602-16T1

Judge De Castro found, by a preponderance of the evidence, that defendant abused and neglected her seven-year-old daughter within the meaning of N.J.S.A. 9:6-8.21(c)(4), by failing to report the sexual abuse committed by the child's biological father for eighteen months, by allowing the child to continue to reside in the same premises as the perpetrator of the abuse, and by allowing the perpetrator to have unsupervised access to the child. Defendant's conduct constituted gross negligence and placed the child at a substantial risk of harm.

"The fact-finding hearing is a critical element of the abuse and neglect process." N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 264 (App. Div. 2002). The judge, as the fact-finder, is there "to determine whether the child is an abused or neglected child as defined herein." N.J.S.A. 9:6–8.44. Our standards of review require us to defer to the Family Part's findings of fact that are based on the credibility of witnesses, N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012), and are supported by substantial competent evidence. N.J.S.A. 9:6-8.46; R. 5:12–4(d).

An "abused or neglected child" is "a child less than 18 years of age whose parent" fails "to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing

to be inflicted harm, or substantial risk thereof."  N.J.S.A. 9:6-8.21(c)(4)(b).

Here, the Division alleged defendant failed to take timely action to protect Mary

from imminent harm.  Under these circumstances, we must determine whether

defendant failed to exercise a minimum degree of care as a matter of law. G.S.

v. Dep't of Human Servs., 157 N.J. 161, 182 (1999).  As the Court explained in

G.S., "the phrase 'minimum degree of care' refers to conduct that is grossly or

wantonly negligent, but not necessarily intentional." Id. at 178.  The Division

must prove that defendant acted with reckless disregard for her daughter's safety.

A finding of abuse and neglect must be based on the totality of the

circumstances.  N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super.

320, 329 (App. Div. 2011).

The Division presented sufficient competent evidence to satisfy this

standard.  We thus affirm substantially for the reasons expressed by Judge De

Castro in her memorandum of opinion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION